UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ROBERT TURBEN,

    Plaintiff,

    v.

NANCY MARTHAKIS and RON NEAL,

    Defendants.

CAUSE NO. 3:19-CV-141-JD-MGG

OPINION AND ORDER

Robert Turben, a prisoner without a lawyer, is proceeding against Dr. Nancy Marthakis and Warden Ron Neal for monetary damages and injunctive relief on his claim of a denial of medical treatment for a right foot injury and his diabetes while housed at the Indiana State Prison. (ECF 7, 14.) He has filed a motion for preliminary injunction pertaining to his medical treatment for his foot injury. ECF 12. Dr. Marthakis and Warden Neal have responded to the motion for preliminary injunction. (ECF 24, 25.)

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction, the moving party must show: (1) he will suffer irreparable harm before the final resolution of his claims; (2) available remedies at law are inadequate; and (3) he has a likelihood of success on the merits. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 323–24 (7th Cir. 2015). The court then "weighs the competing harms to the parties if an

injunction is granted or denied and also considers the public interest." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). Furthermore, under the Prison Litigation Reform Act ("PLRA"), injunctive relief must be "narrowly drawn, extend no further than necessary to remedy the constitutional violation, and must use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012).

> The PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context. Where prison conditions are found to violate federal rights, remedial injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and use the least intrusive means necessary to correct the violation of the Federal right. This section of the PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: Prison officials have broad administrative and discretionary authority over the institutions they manage.

*Id.* at 683 (quotation marks, brackets, and citations omitted).

In moving for injunctive relief, Turben asserts that, since December 15, 2017, when he injured his right foot, he has not received proper medical treatment. (ECF 12 at 1-5.) Specifically, he claims that, over the last twenty months, his foot has been painful, swollen, and turned six different colors. (*Id.* at 4.) Turben states that when he puts pressure on his foot, it causes him to have pain that travels up his back and into his neck. (*Id.*) He states it feels as if someone is "stabbing [him] with a hot ice pick in his big toe." (*Id.*) He claims that, at one point, his right foot was "so fat" that "blood vessels started popping in [his] foot." (*Id.*) To help alleviate his pain, Dr. Marthakis prescribed crutches, but after eight months of use, Turben claims she told him he could no longer use them because they would cause him to have cysts under his arms. (*Id.*) However, Turben asserts that Dr. Marthakis simply read this information on the internet and

2

never checked to see if he had any cysts under his arms. (*Id*.) Furthermore, Turben states that he has been told that his foot will heal itself and Dr. Marthakis said that the only thing wrong with his foot is his "neuropathy, arthritis, or bone degeneration." (*Id*.)

In his motion, Turben asks the court to order the defendant "(i) to stop [his] medical condition from being repeatedly subjected to misdiagnosis; and (ii) for the Defendant to cease and desist from abstracting and/or falsifying State Document(s) relating to [his] medical conditions and the real diagnosis [he] was diagnos[ed] for, while pending a trial on the merits of Plaintiff's Complaint." (*Id*. at 3.) He also asks "to be seen by an outside doctor (podiatrist) and have an MRI done to evaluate the extent of damage." (*Id*. at 4) (emphasis omitted).

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability, a prisoner must satisfy both an objective and subjective component by showing: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). On the subjective prong, the plaintiff must establish that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir.

2005). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008).

The medical record in this case shows that Turben received extensive treatment for his right foot injury. Dr. Marthakis initially examined Turben on January 19, 2018, due to his foot pain. (ECF 24-1 ¶ 4.) She ordered non-weight bearing activity and increased his Mobic dosage. (*Id*.) He had an x-ray of his right foot, which showed no acute fracture or dislocation, and osteopenia without acute osseous abnormality and minimal degenerative changes. (*Id*.) On January 26, 2018, Dr. Marthakis reassessed Turben's foot injury and discussed the x-ray results with him. (*Id*. ¶ 5.) She increased his Neurontin and ordered laboratory tests. (*Id*.) She evaluated his diabetes and determined he had neuropathy. (*Id*.) She recommended he use crutches, have access to a wheelchair, and move to the prison's ground floor. (*Id*.)

In February and March 2018, Turben continued to be treated for his right foot injury. In mid-February, treatment records show that Turben was diverting his Neurontin. (*Id*. ¶ 6.) As a result, his Neurontin was discontinued and he was prescribed Pamelor, a medication used to treat neuropathy or nerve pain. (*Id*.) However, on March 7, 2018, Turben refused to take his Pamelor. (*Id*. ¶ 7.) At the same time, he also refused a wheelchair and ground floor pass. (*Id*.) A week later, on March 14, 2018, Turben would

not take medication to treat his neuropathy and would not use a walker or wheelchair. (*Id.* ¶ 8.)

On May 1, 2018, Dr. Marthakis examined Turben. (*Id.* ¶ 9.) She ordered another x-ray of his right foot and laboratory tests. (*Id.*) She prescribed medication for his neuropathy, but he declined it. (*Id.*) The x-ray results showed a bi-partite medial sesamoid fracture[1] under the first metatarsal head in his right foot, along with osteopenia, and mild degenerate changes without acute abnormality. (*Id.*) However, there was no indication of an acute fracture or dislocation. (*Id.*)

Dr. Marthakis saw Turben for a chronic care visit on June 25, 2018. (*Id.* ¶ 10.) At that appointment, they discussed the fact that his x-rays had produced negative results, except for mild osteopenia. (*Id.*) Turben stated that he did not want to lose his housing placement due to his job and he did not want to use a walker or wheelchair as the use of these devices would compromise his placement. (*Id.*) He stated that he was willing to try Pamelor for his foot pain and would assume the risk of long-term crutch use. (*Id.*) Dr. Marthakis agreed to get Turben custom footwear for his right foot. (*Id.*) She also ordered physical therapy for Turben. (*Id.*)

Turben continued to receive treatment for his foot pain from July 2018 through November 2018. An x-ray from July 5, 2018, showed no fracture or dislocation and no acute bone abnormality in his right foot. (*Id.* ¶ 12.) On August 29, 2018, Turben received orthopedic shoes for his neuropathy but he would not wear it and he refused to use

---

[1] Bi-partite sesamoid bone fractures are commonly treated with conservative measures such as prolonged non-weight bearing to allow the bone to heal. (ECF 24-1 ¶ 23.)

other assistive devices. (*Id.* ¶ 13.) In October 2018, he began physical therapy. (*Id.* ¶ 14.) Turben was given a home exercise program and another x-ray was taken to compare his right and left feet to determine if medial bi-partite sesamoid bones under the first metatarsal head were congenital or due to injury. (*Id.*) An October 31, 2018, a note in Turben's medical record indicated he had not complied with his treatment regimen and was not wearing his orthopedic shoes. (*Id.* ¶ 15.) On November 29, 2018, he was discharged with a home exercise program that he could perform in his housing unit. (*Id.* ¶ 16.)

In February 2019, Turben asked Dr. Marthakis if he could see a podiatrist. (*Id.* ¶ 17.) She told him that he did not need to be seen by a podiatrist and offered him a walker, which he refused. (*Id.*) He was also prescribed Effexor for his foot pain, but he refused it. (*Id.*) Turben was told to have the nursing staff evaluate his right orthopedic shoe but he refused to try on the shoe. (*Id.*) The next month, in March 2019, he again refused ground floor housing and a walker. (*Id.* ¶ 18.) Turben also did not bring his diabetic shoe for his shoe fitting appointment. (*Id.* ¶ 19.) In April 2019, another x-ray of his right foot showed multilevel degenerative changes and persistent bone demineralization but there were no fractures. (*Id.* ¶ 20.) To this day, Turben continues to refuse to use a walker or wheelchair and will not agree to be housed on the ground floor of the prison. (*Id.* ¶ 22.) He is also noncompliant with his pain medication. (*Id.*)

Turben's motion will be denied. He has not shown that he has a reasonable likelihood of succeeding on the merits of this case and he has not shown that he will suffer irreparable harm without injunctive relief. As discussed, Turben's medical record

6

shows he routinely received medical treatment and care for his right foot since he first injured it in December 2017. Dr. Marthakis evaluated his foot on numerous occasions, ordered x-rays, prescribed pain medications, and advised him to use a walker, wheelchair, and move to the ground floor of the prison. Turben also saw a physical therapist, was given a home exercise plan, and prescribed orthopedic shoes. However, he was non-complaint with his treatment plans and refused the care offered to treat his foot pain. In particular, he refused the prescribed prolonged non-weight bearing measures, including a walker, wheelchair, orthopedic shoes, and placement in ground floor housing, which are used to heal bi-partite sesamoid bones. (*Id*. ¶ 23.) Here, the medical record reflects that Dr. Marthakis provided Turben medical care that reflects professional judgment, which is all the Eighth Amendment requires. *See Jackson*, 541 F.3d at 697 ("[M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards.") (internal quotation marks and citation omitted).

Turben also asks to stop being misdiagnosed and for accurate medical records to be kept. (ECF 12 at 3.) A misdiagnosis (and records of that misdiagnosis) are akin to medical malpractice which does not in itself violate the Eighth Amendment. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). Moreover, though Turben disagrees with the diagnosis he has received and considers it a misdiagnosis, a mere disagreement with medical professionals does not establish deliberate indifference nor establish a violation of the Eighth Amendment. *Id*.

Turben further requests that he be seen by a podiatrist and have an MRI done to evaluate the extent of the damage to his foot. (*Id*.) However, the PLRA requires a narrowly drawn remedy. Under the Eighth Amendment, inmates are not, "entitled to demand specific care" or "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). The constitution does not prescribe where nor by whom medical care must be provided. And, as stated, the court has determined that Turben is receiving constitutionally adequate medical care for his right foot.

As a final matter, Warden Neal filed two motions (ECF 21, 22) related to the motion for preliminary injunction. In the first motion (ECF 21), Warden Neal sought clarification as to which Warden the court wanted to respond to the motion for preliminary injunction. In the second motion (ECF 22), Warden Neal requested a one-day extension of time to file a response to the motion for preliminary injunction. Because these motions are now moot, they will be denied.

For these reasons, the court:

(1) DENIES the motion for preliminary injunction (ECF 12);

(2) DENIES AS MOOT the motion for clarification (ECF 21); and

(3) DENIES AS MOOT the motion for an extension to file a response to the preliminary injunction motion (ECF 22).

SO ORDERED on December 23, 2019

/s/ JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT