UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROBERT TURBEN, <br><br> Plaintiff, <br><br> v. <br><br> NANCY MARTHAKIS, <br><br> Defendant. | CAUSE NO. 3:19-CV-141-JD |

OPINION AND ORDER

Robert Turben, a prisoner without a lawyer, is proceeding in this case on two claims against Dr. Nancy Marthakis alleging he received inadequate medical care at Indiana State Prison ("ISP"). ECF 14. Specifically, Turben is proceeding against Dr. Marthakis on one claim "for denying him constitutionally adequate medical treatment for his right foot from February 2018 to present[,]" and on one claim "for denying him constitutionally adequate medical treatment for his diabetes in July 2018[.]" *Id.* at 4.[1] Dr. Marthakis filed a motion for summary judgment. ECF 157. Turben filed a response, Dr. Marthakis filed a reply, and Turben filed an authorized sur-reply. ECF 164, 166, 169. The summary judgment motion is now fully briefed and ripe for ruling.

I.   **LEGAL STANDARDS**

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal

---

[1] Turben was also granted leave to proceed on an injunctive relief claim against ISP Warden Ron Neal, but this claim was dismissed as moot in May 2021 because Turben was transferred from ISP to Plainfield Correctional Facility. ECF 14, 153.

Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009). Summary judgment "is the put up or shut up moment in a lawsuit . . .." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference is a high standard, and is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that

2

the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the defendant has provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Synder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the

appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

**II.     ANALYSIS**

Turben is proceeding against Dr. Marthakis on one claim regarding his foot pain and one claim regarding his diabetes. Each claim will be addressed in turn.

<u>*Turben's foot pain*</u>

Dr. Marthakis first examined Turben on January 19, 2018, due to his complaints of foot pain. ECF 158-2 at 1; ECF 158-3 at 1-3. At that time, Turben had been experiencing moderate pain in his right foot for several months. ECF 158-3 at 2. Dr. Marthakis ordered continued non-weight bearing activity, increased Turben's Mobic dosage, and ordered an x-ray. *Id.* at 3. Turben's foot was x-rayed that day by Meridian Radiology. ECF 158-2 at 1; ECF 158-3 at 5. The x-ray found "no acute fracture or dislocation." ECF 158-3 at 5. Impressions were osteopenia without acute osseous abnormality and minimal degenerative change. *Id.*

On January 26, 2018, Dr. Marthakis assessed Turben and discussed the x-ray results with him. ECF 158-2 at 1-2; ECF 158-3 at 6-8. Dr. Marthakis believed Turben may have been experiencing nerve pain related to his diabetes. *Id.* She submitted a request to increase Turben's Neurontin and ordered labs. *Id.* Dr. Marthakis recommended Turben exchange his crutches for a wheelchair and ground floor access. *Id.* Turben rejected the wheelchair and chose to keep his crutches. *Id.*; ECF 165-1 at 3.

On February 17, 2018, Turben was found to be diverting his Neurontin. ECF 158-2 at 2; ECF 158-3 at 10. As a result, his Neurontin was discontinued and he was

prescribed Pamelor, which is an approved medication to treat nerve pain but does not have the same level of concern for misuse. ECF 158-2 at 2. Turben refused Pamelor for his nerve pain on several occasions between February 2018 and March 2018. ECF 158-3 at 11-14, 16. On March 7, 2018, Turben refused a wheelchair and ground floor pass, stating he did "not want to be confined to a wheelchair." ECF 158-2 at 2; ECF 158-3 at 15. On March 14, 2018, Dr. Marthakis assessed Turben and he refused a wheelchair, a walker, and medication to treat his nerve pain. ECF 158-2 at 2; ECF 158-3 at 20-22.

On May 1, 2018, Dr. Marthakis again examined Turben and ordered another x-ray of his foot. ECF 158-2 at 2; ECF 158-3 at 23-25. Dr. Marthakis also ordered labs and offered Turben medication for his nerve pain, which he declined. *Id.* The x-ray results again found no acute fracture or dislocation. ECF 158-2 at 2; ECF 158-3 at 30. Impressions were a bipartite medial sesamoid under the first metatarsal head, osteopenia, and mild degenerative change without acute osseous abnormality. *Id.* Bipartite sesamoid bones are commonly treated with conservative measures such as prolonged non-weightbearing to allow the bone to heal. ECF 158-2 at 4.

On May 5, 2018, Turben was seen by nursing staff for his foot pain. ECF 158-3 at 27-29. Turben received a Toradol injection, which provided him temporary relief. *Id.*; ECF 165-1 at 6. On May 10, 2018, Turben was again seen by nursing staff for his right foot pain. ECF 158-3 at 31-32. He was offered Mobic, Naproxen, and Tylenol for pain management. *Id.*

On June 25, 2018, Dr. Marthakis saw Turben for a chronic care visit. ECF 158-2 at 2; ECF 158-3 at 37-40. They discussed at length that repeated x-rays of his foot had been

negative except for mild osteopenia. *Id.* Turben expressed he did not want a wheelchair or walker as it would compromise his housing placement. *Id.* Turben said he was willing to try Pamelor for his foot pain and was willing to take on the risks of long-term crutch use. *Id.* Dr. Marthakis ordered custom shoe wear for Turben's right foot and informed him he had been approved for physical therapy and was awaiting scheduling. *Id.*

On October 18, 2018, Turben began physical therapy. ECF 158-2 at 3; ECF 158-3 at 46-47; ECF 165-1 at 7. He was issued a home exercise plan, which involved applying pressure with his foot to a tennis ball to help circulate blood through his foot. *Id.*; ECF 165-1 at 11-12. On November 29, 2018, Turben was discharged from physical therapy with a home exercise plan he could perform in his housing unit. ECF 158-2 at 3; ECF 158-3 at 48.

On February 27, 2019, Turben requested to see a podiatrist. ECF 158-2 at 3. Dr. Marthakis told him he did not need to be seen by a podiatrist and offered him a walker and Effexor for his foot pain, which he refused. *Id.*; ECF 158-3 at 49-50. Turben was told to bring his right orthopedic shoe to the nursing station to have the nursing staff assess and evaluate the fit. *Id.* On March 1, 2019, Turben again refused ground floor housing and a walker. ECF 158-2 at 3.

On February 11, 2020, Turben was seen by a nurse for a chronic care visit and requested pain medication for his foot. ECF 158-3 at 61-63. Turben was offered Cymbalta, Lamictal, Effexor, and Tylenol. *Id.* He signed refusal forms for all except Lamictal and indicated he would call home and then notify medical if he wanted to try

that medication. *Id.* at 63. Because neither party disputes the above facts, the court accepts them as undisputed.

Here, no reasonable jury could conclude Dr. Marthakis was deliberately indifferent to Turben's foot pain. Turben argues Dr. Marthakis continuously failed to provide treatment and never came up with a viable treatment plan, but the medical records refute these assertions. ECF 165-1 at 7, 20. Specifically, it is undisputed that: (1) repeated x-rays found no fracture or dislocation in Turben's foot; (2) impressions of the x-rays were a bipartite sesamoid bone, which is commonly treated with conservative measures such as prolonged non-weightbearing; (3) Dr. Marthakis provided Turben with pain medication, physical therapy, and an orthopedic shoe to treat his foot pain; (4) Turben refused medication for nerve pain on numerous occasions; and (5) Dr. Marthakis attempted to provide Turben a wheelchair, walker, and ground floor access to allow him to remain non-weightbearing, but Turben repeatedly refused these accommodations. Thus, it is undisputed Dr. Marthakis provided care for Turben's foot pain. Accordingly, to defeat summary judgment, Turben must provide evidence Dr. Marthakis' care was "so plainly inappropriate as to permit the inference that [she] intentionally or recklessly disregarded his needs." *See Hayes*, 546 F.3d at 524.

Turben argues Dr. Marthakis' treatment was inappropriate for several reasons. First, Turben argues Dr. Marthakis declined his requests to see a podiatrist, but this amounts to a demand for specific care. *See* ECF 165-1 at 12; *Forbes*, 112 F.3d at 267. Dr. Marthakis attests she did not believe Turben required a referral to a podiatrist, and Turben's disagreement does not amount to an Eighth Amendment violation. *See* ECF

158-2 at 4; *Ciarpaglini*, 352 F.3d at 331. Second, Turben argues Dr. Marthakis misdiagnosed him and he still has an undiagnosed injury. *See* ECF 165-1 at 3. However, Turben provides no evidence he was misdiagnosed. Regardless, a misdiagnosis is akin to medical malpractice, which does not in itself violate the Eighth Amendment. *See Pierson*, 391 F.3d at 902; *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). Lastly, Turben argues Dr. Marthakis never provided any device to assist him in remaining non-weightbearing in the shower and lavatory. ECF 165-1 at 8, 15. However, Turben cannot show Dr. Marthakis was deliberately indifferent for failing to provide him certain non-weightbearing devices when it is undisputed Turben declined to use the non-weightbearing devices recommended to him by Dr. Marthakis.

In summary, it is undisputed Dr. Marthakis provided Turben medical care for his foot pain, and Turben provides no evidence by which a reasonable jury could conclude this care was "plainly inappropriate." *See Hayes*, 546 F.3d at 524. Thus, summary judgment is warranted in favor of Dr. Marthakis on this claim.

*Turben's diabetes*

Turben is proceeding against Dr. Marthakis "for denying him constitutionally adequate medical treatment for his diabetes in July 2018[.]" ECF 14 at 4. The medical records show that, as of May 10, 2018, Turben was on a Humulin 70/30 insulin regimen. ECF 158-3 at 31. At some point in May 2018, Dr. Marthakis changed Turben's insulin regimen from Humulin 70/30 to Novolin 70/30, which are two different brand names for the same type of insulin. ECF 164-3 at 3; ECF 166 at 6, 9; *see* Healthline,

https://www.healthline.com/health/diabetes/humulin-vs-novolin (last visited September 28, 2021).

On June 14, 2018, Turben refused his diabetic diet because the food was bland, unseasoned, and not suitable for a diabetic diet. ECF 158-3 at 33. That same day, Turben refused his insulin shot because his glucose level was low. ECF 158-3 at 36; ECF 164-1 at 7.

Around the beginning of July 2018, Turben became ill and was unable to keep food or water down. ECF 164-1 at 9. On July 2, 2018, Turben refused his insulin shot because he was unhappy he had been switched to Novolin insulin. ECF 158-3 at 41. On July 4, 2018, Turben did not show up for his blood sugar check or insulin shot. *Id.* at 42-43. A nurse sent a correctional officer to check on Turben, and Turben informed the correctional officer he would not go to the nurse's station. *Id.* On July 5, 2018, Turben missed another insulin shot. *Id.* at 44. Turben acknowledges he missed more than three insulin shots in a row during this time period, but asserts he was physically unable to go to the nurse's station because he was sick, continuously vomiting, and severely dehydrated. ECF 165-1 at 8-9, 14.

On July 9, 2018, Turben presented to the nurse's station to have his glucose level checked. ECF 158 at 4. Turben was winded, his color was off, and he had a distant look in his eye. *Id*. Turben was transported to the emergency room, where it was confirmed he was experiencing ketoacidosis.[2] *Id.*; ECF 166 at 6. Turben received an insulin drip

---

[2] In his complaint, Turben asserted his first hospitalization began on July 6, 2018. *See* ECF 7 at 4. However, Turben's summary judgment response does not object to the defendants' assertion his hospitalization began on July 9, 2018. *See* ECF 164.

9

and IV fluids and was discharged from the hospital on July 10, 2018. ECF 7 at 4; ECF 158-3 at 45. After Turben returned from the hospital, Dr. Marthakis ordered that Turben receive a Humulin 70/30 insulin regimen. ECF 158-3 at 45.

On July 12, 2018, the nurse's station received a call around 12:45 p.m. that Turben was not feeling well. ECF 164-6 at 6-11. A nurse went to Turben's cell to assess him and noted he was vomiting, unable to drink fluids, and had not been eating. *Id.* at 10. The nurse notified Dr. Marthakis of the findings and Dr. Marthakis instructed the nurse to place Turben on IV fluids, perform a urine dip, and send him to the emergency room if he was spilling ketones in his urine. *Id.* Based on the results of the urine dip, an ambulance was called at 12:56 p.m. to take Turben to the emergency room. *Id.* Around 1:00 p.m., Dr. Marthakis instructed the nurses to hold off on the emergency room trip, draw Turben's labs, and restart his 70/30 insulin coverage. *Id.* Around 1:50 p.m., a nurse found Turben to be in respiratory distress and called another ambulance. *Id.* The emergency call was cleared at 1:55 p.m. when Turben arrived at the nurse's station. *Id.* Around 1:58 p.m., Dr. Marthakis was notified of the assessment findings and ordered Turben to be sent to the emergency room. *Id.* Turben was transported to the emergency room by ambulance around 2:15 p.m. *Id.* After Turben was stabilized at the emergency room, he returned to the prison and Dr. Marthakis ordered he receive a Humulin 70/30 insulin regimen. ECF 164-5 at 1.

Here, because it is undisputed Dr. Marthakis provided Turben treatment for his diabetes, Turben must provide evidence Dr. Marthakis' care was "so plainly inappropriate as to permit the inference that [she] intentionally or recklessly

10

disregarded his needs." *See Hayes*, 546 F.3d at 524. Turben argues Dr. Marthakis' care was inappropriate for three main reasons.

First, Turben argues Dr. Marthakis was deliberately indifferent for changing his insulin from Humulin to Novolin in May 2018, as he had told her Novolin had made him sick in the past. ECF 164 at 18; ECF 164-3 at 3. However, no reasonable jury could conclude it was "plainly inappropriate" for Dr. Marthakis to change Turben's insulin from Humulin to Novolin, as Humulin and Novolin are brand names of the same drug. Moreover, there is no evidence the change from Humulin to Novolin led to Turben's first hospitalization on July 9, 2018, as Turben received Novolin for several weeks without any issues and was only hospitalized after he missed numerous insulin shots in July 2018. Thus, there is no evidence by which a reasonable jury could conclude Dr. Marthakis violated Turben's Eighth Amendment rights by switching his insulin from Humulin to Novolin in May 2018.

Second, Turben argues Dr. Marthakis was deliberately indifferent for changing his insulin back to a Humulin 70/30 regimen when he returned from the hospital on July 10, 2018, as the hospital physician had placed him on a Humalog 75/25 insulin regimen. ECF 164-1 at 10, 19; ECF 169 at 5, 7-8. Turben argues Dr. Marthakis did not realize Humulin 70/30 and Humalog 75/25 required different dosages, and effectively lowered his insulin dose by fifty percent. ECF 164-1 at 10. Turben asserts that this "mistake" was a "factor" in his second trip to the emergency room. ECF 165-1 at 10. However, Turben cannot show Dr. Marthakis was deliberately indifferent for changing his insulin from Humalog to Humulin, as the Eighth Amendment does not entitle

11

Turben to a specific type of insulin and there is no evidence it was plainly inappropriate to prescribe him Humulin. *See Forbes*, 112 F.3d at 267. Moreover, even assuming Dr. Marthakis acted negligently by mistakenly lowering Turben's insulin dose, negligence does not amount to deliberate indifference. *See Pierson*, 391 F.3d at 902. Based on the record before the court, there is no evidence by which a reasonable jury could conclude Dr. Marthakis violated Turben's Eighth Amendment rights by placing him on a Humulin 70/30 insulin regimen on July 10, 2018.

Third, Turben argues Dr. Marthakis was deliberately indifferent for canceling two emergency signals on July 12, 2018, without evaluating his condition in person. ECF 164-1 at 19-20; ECF 164-3 at 4; ECF 169 at 7-8. Specifically, Turben argues Dr. Marthakis was "reckless" for cancelling the emergency signals "without even diagnosing" him. *See* ECF 164-1 at 19-20. Dr. Marthakis responds it was proper for her to cancel the emergency signals in order to run tests to determine Turben's condition and attempt to stabilize him at the facility before sending him to the emergency room. ECF 166 at 9. Here, it is undisputed Dr. Marthakis cancelled the emergency signals in order to run labs and attempt to stabilize Turben's condition at the prison. Turben argues Dr. Marthakis never evaluated him in person prior to canceling the emergency signals, but it is undisputed Turben was being assessed and tested by nurses who were reporting to Dr. Marthakis. There is no evidence it was necessary for Dr. Marthakis to physically examine Turben in order to appropriately diagnose him. Thus, there is no evidence by which a reasonable jury could conclude it was "plainly inappropriate" for

Dr. Marthakis to elect to run tests and attempt to stabilize Turben's condition prior to transporting him to the emergency room.

Accordingly, it is undisputed Dr. Marthakis provided treatment for Turben's diabetes, and there is no evidence by which a reasonable jury could conclude this treatment was "plainly inappropriate." Summary judgment is thus warranted in favor of Dr. Marthakis on this claim.

For these reasons, the court:

(1) GRANTS the motion for summary judgment (ECF 157); and

(2) DIRECTS the clerk to enter judgment in favor of Dr. Marthakis and against Robert Turben.

SO ORDERED on October 25, 2021

/s/JON E. DEGUILIO  
CHIEF JUDGE  
UNITED STATES DISTRICT COURT

13